UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF DNA | Case No. <br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Luis Ramos, a Task Force Officer with the Drug Enforcement Administration, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.    I am a member of the Danbury Police Department and has been employed by said department for approximately thirty-five years. I have been a detective for approximately twenty-seven years in the Special Investigations Division, which has the primary function of investigating illegal drug trafficking within Danbury, Connecticut. Currently, I am assigned as a Task Force Officer with the  Drug Enforcement Administration (DEA).

2.    As such, I am a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code; that is, an officer empowered by law to conduct investigations of, and make arrests for, offenses enumerated in Section 2516 of Title 18.

3.    During the course of my career, I have participated in numerous criminal investigations including investigations into suspected narcotics trafficking. Such investigations have included the execution of search warrants, debriefing confidential informants, and gathering information from locations such as cellular telephones as well as physical documents. Through these and other investigative tools, I have gathering insight into the manner in which narcotics traffickers obtain, finance, store, manufacture, transport and distribute controlled substances.

## PURPOSE OF THE WARRANT

4.      I submit this affidavit in support of a search and seizure warrant for two buccal DNA swab samples from AMANDA DORMAN (DOB xx-xx-1987). As discussed below, I believe such DNA swab samples may evidence DORMAN's distribution of a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1) (possession with the intent to distribute and distribution of heroin and fentanyl).[1]

5.      The information supplied in this affidavit is based in part upon an investigation into this matter carried out by federal law enforcement agents and officers of the Danbury Police Department.  Because this affidavit is being submitted for the limited purpose of securing search a warrant for DORMAN's DNA, I have not included each and every fact known to me concerning this investigation.

## PROBABLE CAUSE

6.      In the early morning hours of June 23, 2020, the Danbury Police Department responded to an apparent overdose death at a residence in Danbury, Connecticut. The overdose victim (referred to herein as "Victim #1") was pronounced deceased at Danbury Hospital. The Connecticut Medical Examiner subsequently determined that Victim#1 died as a result of acute intoxication due to the combined effects of fentanyl and ethanol. Based on information gathered to date, DORMAN is believed to have supplied Victim#1 with narcotics.  DORMAN placed the 911 call regarding Victim#1's overdose and DORMAN was at the scene of the overdose when authorities arrived. Responding officers interviewed DORMAN at the scene.

---

[1] On or about June 14, 2021, the Honorable U.S. Magistrate Judge Sarah A. L. Merriam authorized a search warrant for Dorman's DNA. Docket No. 3:21mj589(SALM). Law enforcement was unable to locate Dorman to serve the warrant. Based on information obtained through her legal counsel, it appears Dorman has been in a drug treatment program. Dorman is expected in state court for an in-person hearing on December 2, 2021.

7.      DORMAN stated that Victim#1 had been released from a three-year jail term the week prior. DORMAN stated that she had dated Victim#1 since 2012 and that he (Victim#1) had previously overdosed three times. DORMAN stated that she and Victim#1 had gone to dinner and went to a particular individual's house (hereafter referred to as "Victim#2") the night prior (June 22, 2020). DORMAN stated that she and Victim#1 arrived back to her home around midnight. DORMAN stated that she went to sleep and happened to wake up finding Victim#1 collapsed onto his knees at the foot of the bed.

8.      While speaking to DORMAN in the bedroom, officers observed four empty glassine bags in a topless box in an open fronted night table next to the bed. Upon closer inspection, officers determined the bags were stamped "JUNGLE KILLER" with a skull in blue ink and that the bags had been opened and then crumpled and dropped into the box. Law enforcement recovered a single bag from the floor of DORMAN's bedroom in close proximity to the location of Victim#1. U.S. currency was found in DORMAN's dresser. DORMAN stated the currency was hers and was for securing an apartment for her and her son. DORMAN stated that she had obtained the money through her employment as a nanny. Law enforcement also seized three empty baggies with the same stamp, "JUNGLE KILLER," from just outside the entry to the residence. Due to concerns that the drug evidence contained fentanyl, no field tests were conducted. Lab analysis later confirmed the presence of a controlled substance in items seized from the residence, including the presence of fentanyl in the residue in the empty baggies stamped "JUNGLE KILLER." Officers also recovered a sandwich bag at the hospital located on Victim#1's person.

9.      Officers also determined that later on June 23, 2020 at approximately 11:41 EST, there was an additional 911 call regarding a nonfatal overdose made from Victim#2's house.

Victim#2's house is the location DORMAN stated she and Victim #1 had visited on June 22, 2020 prior to Victim #1's overdose early on June 23, 2020. Officers did not recover any drug evidence from this overdose scene. DORMAN denied any involvement in the overdose. She placed the 911 call but left before authorities arrived.[2]  The phone number utilized to make the 911 call at Victim#2's house is the same number that DORMAN identified as her number. This same phone number was also used to report a nonfatal overdose on February 2, 2019 at a particular address in Danbury associated with DORMAN's mother.

10.    On June 24, 2020, Connecticut State Police (CSP) responded to a disabled vehicle on I-84 westbound between Exits 10 and 9 at approximately 12:58 EST. The vehicle, a rented Dodge Ram, was found with its occupants walking westbound towards Exit 9. DORMAN and the other occupant (referred to herein as "T.B") both stated that DORMAN was the vehicle's operator. DORMAN appeared intoxicated and subsequently failed a roadside sobriety test and a later "breathalyzer" examination. Incident to arrest, DORMAN was found to be in possession of approximately 100 dosage units (one brick) of heroin bearing the "JUNGLE KILLER" with blue skull stamp – which was the same stamp found at Victim#1's overdose where DORMAN was present.[3] Due to concerns that the drug evidence contained fentanyl, no field tests were conducted. Lab analysis remains pending.

11.    Law enforcement subsequently sent narcotics evidence from the scene of Victim#1's overdose and the narcotics evidence recovered from DORMAN's vehicle on June 24, 2020 to the Connecticut State Lab for DNA analysis.

---

[2] Authorities did not ask DORMAN about the 911 specifically as they were unaware the call had been placed at the time they spoke with her.
[3] Other than the aforementioned CSP arrest, DORMAN does not have a criminal history.

12.     On February 22, 2021, the State Lab returned an analysis report that stated that a mixture of DNA profiles was located on the swabs taken of the wax folds and the swab taken of a cut piece of straw recovered from DORMAN's vehicle on June 24, 2020. On April 26, 2021, the State Lab returned an analysis report that stated DNA profiles were obtained from evidence recovered from the scene of Victim#1's overdose, specifically a mixture of DNA profiles were identified on the swabbing of an empty plastic bag exterior and a swabbing of a total of eight bags marked "JUNGLE KILLER."

13.     With respect to the evidence seized at the time of Victim#1's overdose, the lab report evidences the following:

a.   The lab identified three contributors, at least one being male, as contributors to the DNA sample identified on the 3 bags seized outside the door of DORMAN's home. A CODIS hit was returned indicating a match between one of the DNA profiles recovered from the 3 bags seized outside the door to DORMAN's home and T.B. The lab report indicates that Victim#1 was not a contributor to the DNA mixture identified on the 3 bags tested.

b.   The lab identified two contributors, at least one being male, to a DNA mixture identified on the 4 bags seized in a topless box in an open fronted night table next to the bed in DORMAN's bedroom. The lab identified Victim#1 as a contributor to the DNA mixture identified on the 4 bags.

c.   The lab identified three contributors, at least one of them being male, to a DNA mixture identified on the single bag recovered from the floor of DORMAN's bedroom. The lab identified Victim#1 as a contributor to the DNA mixture identified on the single bag.

5

    d.   The lab identified three contributors, at least one being male, to a DNA mixture identified on the exterior of a sandwich bag recovered from Victim#1's person. The lab assumed Victim#1 to be a contributor to the sample.

14.    With respect to the evidence seized from DORMAN's vehicle the day after Victim#1's overdose, the lab report evidences the following:

    a.   With respect to a bag containing six bundles of suspected heroin and 5 loose wax folds of suspect heroin recovered in the vehicle:

        i.   A DNA mixture was located on the swabbing of the wax folds of six bundles of suspected heroin.

        ii.   A DNA mixture was located on the swabbing of loose wax folds of suspected heroin.

    b.   With respect to a second bag located in the vehicle, which contained two wax folds of suspected heroin and a cut plastic straw:

        i.   A DNA mixture was located on the swab of two wax folds of suspected heroin.

        ii.   A DNA mixture was located on the swab of the cut plastic straw.

        iii.   A CODIS hit was also returned indicating a match between the cut straw recovered from the bag inside DORMAN's vehicle and T.B.

15.    Based on the facts asserted herein, I believe there is probable cause to believe that DORMAN's DNA may be a match to some or all of the DNA profiles identified by the lab on narcotic evidence described in the February 22, 2021 and the April 26 2021 reports.

**EXECUTION**

16.     DORMAN's DNA samples that I am seeking will be collected by buccal swabbing. This method involves taking a sterile swab (similar to a Q-Tip) and gently scrubbing the inside right cheek, then the inside left cheek, for approximately five to 10 seconds. Two samples are requested in the event that one of the samples becomes contaminated or otherwise cannot be tested. The samples seized will be submitted to the State Lab for examination, testing and analysis, and will be compared to the DNA material obtained from narcotics evidence discussed in the lab report issued on February 22, 2021 discussed herein.

17.     It is understood that DNA profiles or partial DNA profiles of more than one person may be located on an object when more than one person has handled an item.

**CONCLUSION**

18.     Based upon the foregoing, there is probable cause to believe, and I do believe, that, obtaining buccal swabbing sample from the inside of DORMAN's mouth for Serology and Deoxyribonucleic Acid analysis may provide evidence of a violation of Title 21 U.S.C. Sections 841(a)(1) and 841(b)(1) (possession with the intent to distribute and distribution of heroin and fentanyl).

19.     Additionally, given the nature of the charges and the covert status of the investigation, I further request that this request and the instant warrant, if issued, be sealed.

_____

LUIS RAMOS, DEA TFO

Subscribed and sworn to me by telephone or other reliable means on this 30th day of November 2021.

_____

ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE